UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at GREENEVILLE

| | |
|---|---|
| CHARLES MONTAGUE, *et. al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) No. 2:14-cv-292 |
| | ) *Judge Jordan* |
| DERRICK SCHOFIELD, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## **MEMORANDUM and ORDER**

This is a *pro se* civil rights action and proposed class action pursuant to 42 U.S.C. §1983, seeking injunctive and declaratory relief, as well as reimbursement of all costs and fees, including attorney fees (Doc. 2). The complaint purportedly contained the signatures of one-hundred, eighteen (118) prisoners, who are housed in the Northeast Correctional Complex (NECX) in Mountain City, Tennessee.[1]

### I.    **Procedural History**

On December 10, 2014, the Court entered a deficiency order (Doc. 46), observing that not all the listed prisoner plaintiffs had signed the complaint, that others who had signed the complaint had not been captioned as plaintiffs, that some had submitted *in forma pauperis* motions, that no plaintiff had paid a full filing fee, and that there were additional problems with

---

[1] The complaint identified one-hundred, forty-two (142) prisoners as party plaintiffs, with seven prisoners being named twice in that section. Seventeen prisoners who were named as plaintiffs did not sign the complaint. Only those prisoners who purportedly signed the complaint are included in the total of 118 plaintiffs. Though Terry Clifton, Thomas Elder, Keithen Jones, and Tedrick Napier affixed two separate signatures to the complaint, these four individuals have only been counted once as signatories to the pleading.

the pleadings which needed to be addressed by the plaintiffs. The Court set a thirty-day deadline for correcting all cited deficiencies. The order was mailed to all prisoners who were identified as plaintiffs in the complaint.

Twelve inmates who were listed as plaintiffs did not receive the order. The copies of the order which were mailed to them at the NECX were returned to the Court by the postal authorities, with the faces of the envelopes which contained those copies variously marked as follows, "Not at this Facility," "Return to Sender by TDOC," "Refused by Inmate," "Will Not Sign," "Unable to Forward," "Inactive, or Paroled"(Docs. 49, 51- 56, 62-66).

Five prisoners, who were named as plaintiffs, responded to the deficiency order by filing notices under penalty of perjury, disclaiming that they signed the complaint, ever desired to be plaintiffs in the lawsuit, or authorized anyone to include them as plaintiffs (Docs. 50, 60-61, 84, and 96).

Thirteen prisoners who had failed to proffer a filing fee or an *in forma pauperis* application have responded to the deficiency order by submitting the paperwork necessary for a pauper determination. These thirteen prisoners join the sixteen prisoners who filed *in forma pauperis* applications prior to the deficiency, and it is these twenty-nine prisoners who both have signed the complaint and submitted *in forma pauperis* applications who will be considered to be plaintiffs. These are the twenty-nine plaintiffs: 1) Charles Montague, 2) John Anderson, 3) Gregory Bowman, 4) Ronald Brewer, 5) Larry Brown, 6) Nikos Burgins, 7) Patrick Champion, 8) L. Churchwell, 9) Milton Cooper; 10) Carlos Eaton, 11) Orlando Fields, 12) David Lackey, 13) Craig Majors, 14) Aaron Malone, 15) Leon McKissack, 16) Victor D. McMiller, Sr., 17) William Newby, 18) Norman Page, 19) Jose Perez, 20) Baron Pinkney 21) Samuel Ramsey, 22)

2

Darrell Swinney, 23) Kevin Tate, 24) Octavious Taylor, 25) Walter Webb, 26) Hugh Williams, 27) Ricardo Wiggins, 28) Tony Williams, and 29) Odell Wisdom.

All other prisoners are **DISMISSED** as plaintiffs in this lawsuit for want of prosecution, Fed. R. Civ. P. 41(b), due to their failures to respond to the deficiency order, their failures to correct the cited deficiencies in the pleading, or their failures to sign the complaint or submit *in forma pauperis* applications, or due to their notices and disclaimers.

## II.     Class Action

Plaintiff Montague has submitted an implied request, pursuant to Rule 23, to have this lawsuit certified as a class action "for the prompt dispatch of business," noting the "cohesiveness/ unity on the part of the plaintiffs/class members" (Doc. 95, p. 1). An action cannot be certified as a class action, unless the prerequisites set forth in Rule 23(a) of the Federal Rules of Civil Procedure have been satisfied. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011) (citing *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 161, 102 S. Ct. 2364 (1982). There are four prerequisites in Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

First of all, the plaintiffs, including plaintiff Montague, who seeks to represent the class, have failed to define the putative class of prisoners who would pursue this lawsuit. Nor can the Court discern from the allegations set forth in the complaint the identity of the proposed class of prisoners. Thus, it is unclear as to whether the class in this case would encompass some prisoners in the NECX; all prisoners in the NECX; some TDOC prisoners; all TDOC prisoners; or some

3

entirely different group of inmates, for example, Muslim inmates. "To maintain a class action, the existence of the class must be pleaded and the limits of the class must be defined with some specificity." *Newsom v. Norris*, 888 F.2d 371, 381 (6th Cir. 1989) (quoting *Wilson v. Zarhadnick*, 534 F.2d 55, 57 (5th Cir.1976)). The pleading does not conform to this requirement.

Nor has the fourth prerequisite for class certification, i.e., that the representative parties must protect the interests of the class fairly and adequately, been satisfied, since plaintiff Montague proposes himself as the representative party. Ordinarily, "pro se prisoners cannot adequately represent a class." *Ziegler v. Michigan*, 59 F. App'x 622, 624 (6th Cir. 2003). Indeed, the Sixth Circuit has affirmed a district court's denial of class certification in a proposed class action by pro se prisoners, stating that "no representative party was available because pro se prisoners are not able to represent fairly the class." *Palasty v. Hawk*, 15 F. App'x 197, 200 (6th Cir. 2001) (citing *Fymbo v. State Farm Fire & Cas. Co.*, 213 F.3d 1320, 1321 (10th Cir. 2000) and *Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir.1975)); *Inmates, Washington Co. Jail v. England*, 516 F. Supp. 132 (E.D. Tenn. 1980), *aff'd,* 659 F.2d 1081 (1981).

Therefore, because there is no adequate representative party, the Court **DENIES** class action certification to the plaintiffs in this suit. *See Johnson v. Brown*, 581 F. App'x 777, 781 (11th Cir. 2014) (affirming district court's denial of *pro se* prisoner's motion for class certification since 28 U.S.C. § 1654, the section which allows parties to proceed *pro se*, provides "a personal right that does not extend to the representation of the interests of others") (quoting *Timson v. Sampson*, 518 F.3d 870, 873 (11th Cir. 2008)). The Court turns now to the twenty-nine pending *in forma pauperis* applications. *See McGore*, 114 F.3d 604 ("When an inmate seeks pauper status, the only issue is whether the inmate pays the entire fee at the initiation of the

4

proceeding or over a period of time under an installment plan [since p]risoners are no longer entitled to a waiver of fees and costs.").

## III. Severance

Some district courts in this circuit sever the claims of each *pro se* plaintiff in a multi-prisoner lawsuit, such as the instant action. *See Ward-El v. Heyns*, No. 13-13595, 2013 WL 4776114, at *1 n.1 (E.D. Mich. Sept. 6, 2013) (listing cases).

One factor which cuts against allowing multiple prisoners to advance their claims in a single lawsuit is that a prison population is constantly in flux. *Id.*, 2013 WL 4776114, at *3 (noting that "jail populations are notably transitory, making joint litigation difficult") (citations and internal quotation marks omitted). That factor is present here, as evidenced by correspondence returned to the Court by the postal authorities upon the transfer, release or parole of the putative plaintiff- addressee.

Another problem is that, although pleadings must be signed by all parties, not all *pro se* prisoner plaintiffs in multi-prisoner lawsuits will sign pleadings, motions, and other papers filed in the litigation. Rule 11(a) of the Federal Rules of Civil Procedure requires that every pleading, written motion or other paper be signed by every party who is unrepresented. The Rule 11 requirement is a problem here, as plaintiff Montague has filed several motions and notices signed only by himself, but which have been submitted on behalf of other plaintiffs (Docs. 3 -5, 9-11, 14, 57, 73, and 95). Since plaintiff Montague is not a class representative or a lawyer, any pleadings, motions or papers he signs on behalf of other inmates are not properly before the Court and, to the extent that any of these filings on behalf of other plaintiffs remain pending, they will not be considered.

5

A related problem is that allowing multi-prisoner lawsuits often results in pleadings being filed on behalf of plaintiffs without their consent. *See Proctor v. Applegate*, 661 F.Supp. 2d 743, 780 (E.D.Mich. 2009). Here, too, this is a problem. As observed previously, several putative plaintiffs have filed sworn notices disavowing that they signed the complaint or that they authorized anyone else to sign it for them.

Yet another difficulty encountered in multi-prisoner lawsuits is that some inmates may be subject to the three-strikes rule in 28 U.S.C. § 1915(g),[2] which precludes a prisoner who is subject to that rule from proceeding in a suit *in forma pauperis*, unless he is alleging that he is in imminent danger of serious physical injury. *See Taylor v. First Med. Mgmt.*, 508 F.App'x 488, 493 (6th Cir. 2012) (holding that "actions should be determined and strikes allocated on a prisoner-by-prisoner basis" and that "a holding otherwise would undermine the purpose of the PLRA: it would allow prisoners to join their cases in the hopes of finding one claim with merit among them, thereby avoiding strikes"). That circumstance is present in this case also.

Another complication arises in a lawsuit involving multiple prisoner plaintiffs, where most or all are permitted to proceed *in forma pauperis* and where each plaintiff pays only a pro-rata share of a single filing fee—the fee assessment and collection process would present an administrative nightmare. *See Jones*, No. 05CV07-JHM, 2005 WL 1175960, at*4 (noting the "enormous bookkeeping implications for both Clerk's offices and prison financial offices" entailed by allowing each prisoner to pay a portion of the filing fee).

The filings in the instant case underscore this point. Plaintiff Montague submitted a check in the amount of $3.00 as a "partical [sic] payment towards the filing fee" (Doc. 47). The

---

[2] Under § 1915(g), a prior civil case or appeal brought in federal court qualifies as a strike, if it is dismissed because it is frivolous, malicious, or fails to state a claim upon which relief may be granted.

6

check was returned to him by the Clerk's office, and in response, he wrote the Court a letter stating that "[t]his enclosed check is a filing fee payment for this case, and there are around 141 plaintiffs on the suit. Please do not send the $3.00 check back to me a second time, but accredit [it] towards the filing fee . . . ." (Doc. 48).[3]

Based on the reasoning of the courts which have severed the claims of prisoners in multi-plaintiff civil lawsuits, *see e.g., Proctor v. Applegate*, 661 F.Supp. 2d 743, 780 (E.D.Mich. 2009); *Jones v. Fletcher*, No. 05CV067-JMH, 2005 WL 1175960 (E.D. Ky. May 5, 2005), the Court has determined that the wiser course of action is to sever the claims of each plaintiff, except for plaintiff Montague's claims. *See Proctor*, 661 F.Supp. 2d at 754, 781-82 (severing the improperly-joined claims and *pro se* prisoner plaintiffs because allowing the claims to advance as a group would be "unwieldy and impossible to manage"); *Jones,* 2005 WL 1175960, at *4 (5 (severing all *pro se* prisoners' claims in a multi-plaintiff suit, save those of the lead plaintiff's); *but see Ward-El v. Heyns,* No. 13-13595, 2013 WL 4776114, (E.D. Mich. Sept. 6, 2013) (dismissing multi-prisoner complaint without prejudice to the plaintiffs filing individual complaints); *Spencer v. Bynum*, No. 2:13-13056, 2013 WL 4041870, at *4 (E.D. Mich. Aug. 8, 2013) (dismissing a multi-prisoner *pro se* civil rights based on many deficiencies, including misjoinder of parties, without prejudice to the individual plaintiffs filing complaints on their own behalf).

---

[3]  If each of the 141 prisoners to which Montague refers paid a proportionate share of the $350 filing fee, Montague's share would be only $2.48, meaning that his $3.00 check would represent an overpayment of his portion of the filing fee and that the Clerk would be tasked with processing a refund of any overpayment of the filing fee.  Apparently, plaintiff Montague "mistakenly assumed that he, and not the Court had the authority to determine who would pay the filing fee" *id.*, 2005 WL 1175960, at*4, and how much each prisoner would pay.  That authority resides in this Court.  Likewise, plaintiff Swinney submitted a $3.00 check, which similarly was returned to him (Docket Entry of Dec. 24, 1014).

Accordingly, it is **ORDERED** that this action is deemed to have been brought only by plaintiff Charles Montague; that the other twenty-eight plaintiffs are not joined as parties in this civil rights lawsuit; and that the claims of those other twenty-eight plaintiffs are **SEVERED**.

The Clerk is **DIRECTED** to open new cases for each of those twenty-eight other plaintiffs. The Clerk shall place a copy of the complaint, this memorandum and order, and any other filings made by that specific plaintiff into each plaintiff's newly-opened case. To promote judicial economy and the wise allocation of resources, each newly-opened case should be assigned the undersigned district judge. Each plaintiff will be afforded an opportunity to file an amended complaint alleging how the events or conditions set forth in the complaint have violated that specific plaintiff's constitutional rights.

## IV.    Filing-Fee Issue

As noted, each of the twenty-nine plaintiffs has filed a motion for leave to proceed *in forma pauperis*. If their motions are granted, the question becomes whether they pay a pro rata portion of a single filing fee or whether each is responsible for a full filing fee of $350.

In resolving this issue, the Court is mindful that "[t]he intent of the [PLRA] was to deter frivolous and vexatious prisoner litigation by exposing prisoners to the same financial risks and considerations faced by other litigants." *In re Alea*, 286 F.3d 378, 380 (6th Cir. 2002); *see also Woodford v. Ngo,* 548 U.S. 81, 109 (2006) (Stevens, J., dissenting) (noting that one of the purposes of the PLRA, was to reduce the number of frivolous lawsuits by prisoners); *Riley v. Kurtz*, 361 F.3d 906, 917 (6th Cir. 2004) ("One of Congress' purposes in passing the PLRA was to reduce the large number of frivolous prisoner lawsuits being filed in federal courts."); *Hadix v. Johnson*, 230 F.3d 840, 845 (6th Cir. 2000) ("Congress may have reasonably believed that many

8

of these claims involved trivial or frivolous allegations, particularly when compared to the relief sought in civil rights litigation brought on behalf of non-incarcerated plaintiffs.").

Because the claims of each plaintiff have been severed and because the Court finds that allowing the plaintiffs to proceed upon each plaintiff's payment of a pro rata share of a single filing fee would disserve the purpose behind the enactment of the PLRA, the Court agrees with the reasoning of those courts that the problems encountered in allowing a case to proceed as a multi-prisoner civil action counsel against the assessment of a single filing fee. *See Hubbard v. Haley*, 262 F.3d 1194, 1198 (11th Cir. 2001) (holding that the PLRA, enacted to deter frivolous lawsuits by prisoners, does not allow multiple prisoners to join claims in a single § 1983 action so as to split filing fees but requires payment of the full filing fee by each individual prisoner); *Hagan v. Rogers*, 570 F.3d 146, 154–55 (3d Cir. 2009) (finding that while the PLRA does not prohibit joinder of claims by prisoners proceeding in forma pauperis, it does not allow split filing fees so that each prisoner plaintiff must pay the full filing fee); *Boriboune v. Berge*, 391 F.3d 852 (7th Cir. 2004) (same).

### A. Assessment

Accordingly, the applications to proceed without prepayment of the filing fee submitted by plaintiffs: 1) Charles Montague, 2) John Anderson, 3) Gregory Bowman, 4) Ronald Brewer, 5) Larry Brown, 6) Nikos Burgins, 7) Patrick Champion, 8) L. Churchwell, 9) Milton Cooper; 10) Carlos Eaton, 11) Orlando Fields, 12) David Lackey, 13) Craig Majors, 14) Aaron Malone, 15) Leon McKissack, 16) Victor D. McMiller, Sr., 17) William Newby, 18) Norman Page, 19) Jose Perez, 20) Baron Pinkney 21) Samuel Ramsey, 22) Darrell Swinney, 23) Kevin Tate, 24) Octavious Taylor, 25) Walter Webb, 26) Hugh Williams, 27) Ricardo Wiggins, 28) Tony Williams, and 29) Odell Wisdom are **GRANTED** (Docs. 1, 12-13, 15-18, 21-25, 37, 40, 42, 44,

9

58, 67-68, 71-72, 77-78, 82, 88-89, 97 and 99); the duplicate applications to proceed without prepayment of the filing fee submitted by plaintiffs McKissack, Brewer, and Lackey are **DENIED** as **MOOT** (Docs. 86, 92, and 94); and each of these plaintiffs is **ASSESSED** the full filing fee of three hundred and fifty dollars ($350). 28 U.S.C. § 1915(b) (1). (For reasons which appear below, plaintiff Patrick Champion's *in forma pauperis* application is considered separately from the other plaintiff's applications.)

## B. Fee Collection Procedures

The custodian(s) of plaintiffs Burgins' and Malone's inmate trust accounts at the institution where each now resides is **DIRECTED** to submit to the Clerk of Court twenty percent (20%) of each of these plaintiff's preceding monthly income credited to the account, but only when the amount in the account exceeds ten dollars ($10), until the full $350 fee has been paid to the Clerk of Court. 28 U.S.C. § 1915(b)(2).[4]

The custodian of the trust accounts of the other plaintiffs, with the exception of plaintiff Champion, shall submit, as an initial partial payment, whichever is the greater of: (a) twenty percent (20%) of the average monthly deposits to each plaintiffs' inmate trust account; or (b) twenty percent (20%) of the average monthly balance in each plaintiff's inmate trust account for the six-month period preceding the filing of the complaint. 28 U.S.C. § 1915(b)(1)(A) and (B).

Thereafter, the custodian shall submit twenty percent (20%) of each plaintiff's preceding monthly income (or income credited to his trust account for the preceding month), but only when such monthly income exceeds $10.00, until the full filing fee of $350.00 has been paid to the

---

[4] Typically, a prisoner is assessed an initial partial filing fee, but plaintiffs Burgins and Malone have zero (0) balances in their trust accounts (Docs. 22 and 89). An initial partial filing fee is not required when a prisoner possesses no funds in his trust account, though he "is still obligated to pay the full filing fee when money does become available." *McGore v. Wrigglesworth*, 114 F.3d 601, 601 (6th Cir. 1997), *overruled on other grounds by LaFountain v. Harry*, 716 F.3d 944 (6th Cir. 2013).

10

Clerk's Office. *Id.* All payments should be mailed to: Clerk's Office, USDC; 220 W. Depot Street, Suite 200; Greeneville, TN 37743.

The Clerk is **DIRECTED** to mail copies of this Order to the custodian of inmate trust accounts at the NECX and to the Commissioner of the Tennessee Department of Correction, Derrick D. Schofield, to ensure compliance with the fee assessment procedures outlined herein. The Clerk is further **DIRECTED** to forward a copy of this Memorandum and Order to the Court's financial deputy.

### C. Three-Strikes Rule (Plaintiff Champion)

As to the application to proceed without prepayment of the filing fee submitted by plaintiff Patrick Champion, the Court has checked the U. S. Party-Case Index in Pacer (Public Access to Court Electronic Records), which lists the parties who are or who have been involved in federal litigation. The index also indicates whether any of a party's prior cases have been dismissed and sets forth the basis for the dismissal. Performing this task is important because, as noted previously, 28 U.S.C. § 1915(g) prohibits a prisoner from proceeding in a case *in forma pauperis* if he has filed three prior civil actions or appeals in a federal court which have been dismissed as frivolous, malicious or for failure to state a claim, unless the prisoner is alleging that he is in imminent danger of serious physical injury.

Records in the Party-Case Index indicate that plaintiff Champion is a "three strike filer subject to the restrictions contained in 28 U.S.C. § 1915(g)." *Champion v. Conley*, No. 13-2034-STA-tmp (W.D.Tenn. Sept. 24, 2013) (Order of Sept. 24, 2013, dismissing his case without prejudice under § 1915(g)). Therefore, plaintiff Champion's application to proceed *in forma pauperis* is **DENIED** (Doc. 30), and unless, within thirty (30) days of the date on this order, he submits the full $350 filing fee, his case will be **DISMISSED** without prejudice.

11

## V.   Screening

Though this case now contains only the claims of plaintiff Montague, the pleading was drafted in such a way that it is nearly impossible to detail the allegations made only with respect to plaintiff Montague. Be that as it may, the pleading must still be screened because, under the Prison Litigation Reform Act (PLRA), district courts must screen prisoner complaints and sua sponte dismiss those that are frivolous or malicious, fail to state a claim for relief, or are against a defendant who is immune. *See, e.g., Benson v. O'Brian*, 179 F.3d 1014 (6th Cir. 1999).

> Responding to a perceived deluge of frivolous lawsuits, and, in particular, frivolous prisoner suits, Congress directed the federal courts to review or "screen" certain complaints sua sponte and to dismiss those that failed to state a claim upon which relief could be granted, that sought monetary relief from a defendant immune from such relief, or that were frivolous or malicious.

*Id.* at 1015-16 (6th Cir. 1999) (citing 28 U.S.C. §§ 1915(e)(2) and 1915A).   In screening complaints, the Court bears in mind the rule that *pro se* pleadings filed in civil rights cases must be liberally construed and held to a less stringent standard than formal pleadings drafted by lawyers. *Haines v. Kerner*, 404 U.S. 519, 520 (1972). Still, the complaint must be sufficient "to state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), which simply means the factual content pled by a plaintiff must permit a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). The Court examines the complaint in light of those requirements.

## VI.   Review of the Complaint

The pleading is disorganized, confusing, overlapping, and repetitive and contains a hodgepodge of allegations. Of necessity, the Court has broadly construed the contentions and has

12

grouped together similar claims, which are scattered throughout the pleading, in an attempt to bring order to the body of claims.

## A. General Claims of Unconstitutional Conditions and Violations of Rights

### 1. Allegations

Defendants TDOC Commissioner Schofield and Warden McAllister should have known that placing rival gang members in the same units and allowing these rivals to engage in recreation at same time would lead to gang violence. Plaintiffs are now locked down, due to gang violence, though they were not issued disciplinary reports and had nothing to do with gang violence.

Also, inmates cannot perform legal research—a violation of their right of access to the courts. Plaintiffs' religious programs have been eliminated. The square footage in single or double-occupancy cell is 24 to 35 square feet. Inmates' hot pots—items which are listed as approved for an inmate to possess—have been seized pursuant to a policy.[5]

The medical delivery system is minimally adequate, and there are problems with delays in rendering medical care and in the provision of follow-up medical care, prescriptions, and medically-prescribed diets. Prisoners' ailments are misdiagnosed and inmates' families must pressure NECX authorities to provide proper medical treatment for their relatives. The provision of medical attention to inmates is mismanaged. For example, sick call for inmates occurs at the same time as inmates are eating in the dining hall, which causes some prisoners to miss the opportunity to obtain medical attention in response to sick call requests and makes inmates' access to medical care both cumbersome and difficult.

### 2. Law & Analysis

---

[5] This claim is duplicated on page 30 of the complaint.

Case 2:15-cv-00127-RLJ   Document 4   Filed 04/22/15   Page 13 of 32   PageID #: 207

The Eighth Amendment proscribes cruel and unusual punishments. A punishment is cruel and unusual when it inflicts unnecessary and wanton pain. Included among such punishments are those which are totally lacking in penological justification. *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). An Eighth Amendment claim is composed of two parts: an objective component, which requires plaintiff to show a "sufficiently serious" deprivation, and a subjective component, which requires a showing of a sufficiently culpable state of mind —one of deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834 and 842 (1994).

Where prison conditions are concerned, a sufficiently serious deprivation is one "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling v. McKinney*, 509 U.S. 25, 36 (1993) (emphasis in original). Deliberate indifference is illustrated by a prison official who acts or fails to act despite knowledge of a substantial risk of serious harm to the inmate. *Farmer*, 511 U.S. at 82. "Deliberate indifference is more than negligence and approaches intentional wrongdoing." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (citation and internal quotation marks omitted). The Eighth Amendment requires that prison officials "take reasonable reasonable measures to guarantee the safety of the inmates." *Farmer*, 511 U.S. at 832-33 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-527 1984)).

### a) Gang Violence

Plaintiff does not appear to be alleging that he either was subjected to gang violence or was himself involved in gang violence, as indeed he maintains that he had nothing to do with gang violence. Plaintiff seemingly is complaining about being locked down unjustly for the

14

gang violence in which others engaged, but in which he himself did not participate. If that is plaintiff's true claim, he fails to state a claim of constitutional import.

Plaintiff has no constitutionally protected interest in not being locked down for gang violence, regardless of whether or not he participated in that misconduct. *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (finding that an inmate has no liberty interest in being free of a restraint unless it imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life"); *see also Bazzetta v. McGinnis*, 430 F.3d 795, 804 (6th Cir. 2005) (observing that "a transfer to a maximum security facility with more burdensome conditions is within the normal limits or range of custody which the conviction has authorized the State to impose"). A valid conviction allows a state constitutionally to deprive a criminal defendant of his liberty, confine him in a prison and subject him to its rules so long as conditions of confinement fall within the parameters of the sentence imposed. *See Montanye v. Haymes*, 427 U.S. 236, 242 (1976).

Being placed on lock-down status, even though plaintiff finds it burdensome, is "within the normal limits or range of custody which the conviction has authorized the State to impose." *Sandin,* 515 U.S. at 478 (quoting *Meachum v. Fano*, 427 U.S. 215, 225 (1976)). Plaintiff has no constitutional claim in this regard.

### b) First Amendment (Access to Courts)

Plaintiff's allegation that inmates' right of access to courts is infringed upon by their inabilities to perform legal research implicates the First Amendment. A prisoner has a First Amendment right "to petition the Government for redress of grievances," and this includes a right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 822 (1977). In order to succeed on a claim for denial of access to the courts, a plaintiff must show that he has actually been impeded

15

in his efforts to pursue a non-frivolous legal claim regarding his conviction or conditions of confinement. *Lewis v. Casey*, 518 U.S. 343, 351 (1996).

This means that a plaintiff "must plead and prove prejudice stemming from the asserted violation. Plaintiff[] must demonstrate, for example, that the [alleged infringement of his right] caused such actual injury as the late filing of a court document or the dismissal of an otherwise meritorious claim." *Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996) (citing *Lewis*).

Plaintiff has not alleged that he has been prejudiced in filing this instant suit or has suffered any "litigation related detriment" to this case or any pending state criminal proceedings. *See id*. Thus, because plaintiff has not shown that he has sustained an actual injury in his efforts to litigate a non-frivolous claim, he fails to state a claim for denial of his right of access to the courts.

### c) First Amendment (Free Exercise of Religion)

Plaintiff's contention that religious programs at the NECX have been cut likewise implicates the First Amendment. While incarcerated, prisoners retain certain constitutional rights, including their First Amendment right to exercise their religious beliefs, *Cruz v. Beto*, 405 U.S. 319 (1972); *Thompson v. Kentucky*, 712 F.2d 1078, 1080 (6th Cir. 1983), subject to reasonable restrictions and limitations by prison officials. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350-53 (1987); *Turner v. Safley*, 482 U.S. 78, 88-93 (1987). "A prisoner alleging that the actions of prison officials violate his religious beliefs must show that the belief or practice asserted is religious in the person's own scheme of things and is sincerely held." *Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (citation and internal quotation marks omitted); *McCoy v. Celeste*, No. 87-3500, 1988 WL 1358, *1 (6th Cir. Jan. 13, 1988) (no free exercise claim is stated, "unless a prisoner can show that he has a sincerely held belief, deeply rooted in his religion"). And it is "[o]nly after a prison inmate shows a sincere belief that his or her

16

religion requires the practice at issue does the court move on to determining whether the prison's actions restricting the practice are valid." *Barhite v. Caruso*, 377 F. App'x. 508, 510-511 (6th Cir. 2010) (citations omitted).

Plaintiff has offered no allegations of fact whatsoever to support that the curtailment of religious programs has violated his right freely to practice his religion. Again, he states no claim with respect to the TDOC's diminished support, financial or otherwise, for prison religious programs.

## d) Space Limitations

In his next claim, plaintiff contends that the square footage in single- or double-occupancy cell has been reduced to 24 to 35 square feet. Again, plaintiff offers no allegations at all to show how these space restrictions amount to a constitutional violation. To the extent that plaintiff is attempting to make out an implied claim for overcrowded conditions of confinement, prison overcrowding, in and of itself, is not unconstitutional. *Owens v. Campbell*, No. 98-6770, 1999 WL 1023690, at*1 (6th Cir. Nov. 5, 1999) (citing *Rhodes v. Chapman* , 452 U.S. 337, 347-48 (1981)). Of course, if overcrowded conditions cause an inmate to be denied the minimal civilized measure of life's basic needs, such as food, warmth, or exercise, this would be impermissible under the Eighth Amendment. *Wilson v. Seiter*, 501 U.S. 294, 298, 304 (1991).

Here, plaintiff has not demonstrated the deprivation of a single, identifiable human need to sustain his claim of overcrowding. Thus, this claim fails entirely.

## e) Due Process (Hot Pots)

Plaintiff maintains, in this claim, that hot pots, which are on the TDOC list of approved items, have been seized pursuant to a policy. In broadly construing the claim, the Court deems that plaintiff is alleging that a hot pot which he owned was seized in violation of his right to due process of law.

17

However, to state a claim for violation of procedural due process, a plaintiff must show he has no meaningful state post-deprivation remedies available or that such remedies are ineffective to protect his property rights. *Parratt v. Taylor*, 451 U.S. 527, 539 (1981), *overruled on other grounds by Daniel v. Williams*, 474 U.S. 327 (1986); *Vicory v. Walton,* 721 F.2d 1062, 1064 (6th Cir. 1983).

In this case, the plaintiff has failed to make such a showing, since he may contest the seizure of his hot pot through the institutional grievance procedure, *see Jones v. Burton*, No. 05-4084, 173 F.App'x 520, 522 (7th Cir. 2006); by filing a claim under Tennessee's Governmental Tort Liability Act; by filing a common law action for conversion; or by petitioning TDOC for a declaratory order and, if that petition fails, by filing an action for a declaratory order in the Davidson County Chancery Court. *See Blackmon v. Norris*, 775 S.W.2d 367, 368 (Tenn. Ct. App. 1989).

#### f) Medical Claims

Plaintiff's claims about general inadequacies in the medical delivery system at the NECX do not encompass any allegation that he himself had a serious medical need to which a defendant showed deliberate indifference—a requirement for stating a constitutional medical mistreatment claim. *Estelle v. Gamble*, 404 U.S. 97, 104 (1976). Insofar as plaintiff bases any of his claims upon the impingement of the rights of other inmates, he lacks standing to present them. An inmate must assert his own rights, not those of other inmates. *See Whitmore v. Arkansas*, 495 U.S. 149, 166 (1990).

In sum, none of the above allegations state viable constitutional claims.

### B. Person Safety Issues (Compl., p. 11)[6]

---

[6] These claims are duplicated on page 31 of the complaint.

18

## 1. Allegations

Shortcomings in inmates' custody levels lead inmates in minimum custody to "face the distinct possibility of assaults and/or sexual rape at the hands of other inmates [and t]here is one guard per shift for each housing unit" (Doc. 1, p. 11). Furthermore, the problems encountered by medium security inmates "are not much different" (*Id.*). Among the predicaments confronted by inmates designated as "close custody" is that this custody level represents "a higher security risk of escape or antisocial behavior" than that posed to inmates who are classified as medium security. Furthermore, inmates classified to close custody are housed in the same units as those classified as minimum and medium custody levels. Protective custody level is intended to segregate vulnerable inmates from those in the general population, and such segregated inmates are not allowed in the same cell or in the same exercise area with other inmates.

## 2. Law & Analysis

The Constitution does not guarantee an inmate any particular custody level in prison. *Ford v. Harvey*, 106 F. App'x 397, 399 (6th Cir. 2004) (observing that "a prisoner does not have a constitutional right to placement in any particular prison, or in a particular security classification") (citing *Olim v. Wakinekona*, 461 U.S. 238, 245 (1983), and *Montanye v. Haymes*, 427 U.S. 236, 242 (1976)).[7] Plaintiff has no claim based upon his custody level, whatever his level of custody. To the extent that plaintiff's claims are constructed on assertions of the rights of other inmates, he has no constitutional standing to bring them. *Whitmore*, 495 U.S. at 166.

As to plaintiff's contention regarding physical assaults by other inmates, prison officials have a constitutional duty to protect prisoners who are committed to their care from the violent

---

[7] One caveat is in order. Transfer to a "supermax" prison, where the conditions are substantially more onerous than any other form of incarceration, does impose on an inmate an atypical and significant hardship, so as to violate due process. *Wilkinson v. Austin*, 545 U.S. 209 (2005). No issue concerning a supermax prison has arisen in this case.

19

acts of other prisoners. *Farmer*, 511 U.S. at 833-34. An inmate's allegation that correctional authorities have failed to protect him from an assault by another inmate may state an Eighth Amendment claim under § 1983. *Id.*

As noted, plaintiff has not identified the custody level to which he has been classified, nor offered any allegations of fact to show that he himself is in danger of an assault. And of course, plaintiff cannot assert the rights of other inmates who may face attacks due to their custody levels. Plaintiff thus fails to state a claim under the Eight Amendment.

## C. Overcrowding & Staffing (Compl., pp. 13-16)[8]

### 1. Allegations

Inmates are denied opportunities to exercise on the NECX ball field, though the denial of exercise in this location was not justified by any extreme climate conditions. Beds were added to top tier cells at the NECX, in disregard of the designated capacity of the prison. Housing inmates in such close quarters incites violence and, thus, violates the settlement agreement in *Grubbs v. Bradley*, 821 F.Supp. 496 (M.D.Tenn. 1993).

TDOC has instituted a Tier Management System (TMS), which requires that each cell be unlocked manually with a key, which is solely in the possession of the unit manager. This procedure will create a bottle neck at the pod door when all inmates exit their cells. The congestion of inmates at the pod door likewise poses a fire hazard. The TMS also limits law library access and provides no avenue for inmates to seek extended hours of law library use. Further, pursuant to the TMS, computers were removed from the law library and were not replaced, impeding inmates' access to the courts.

---

[8] These claims essentially are duplicated or re-alleged on page 32 of the complaint.

Also, under the TMS, inmates now are housed on the main compound and all are classified, overtly or covertly, as close custody, whereas the pre-TMS system separately housed prisoners who had minimum restricted, medium, close, and maximum security custody designations. Many assaults and tensions stem from the placement of close security inmates with inmates in the general prison population who have been classified to lesser security levels.

### 2. Law & Analysis

#### a) Eighth Amendment (Exercise)

Prisoners enjoy a right to exercise, within certain parameters. "It is generally recognized that a total or near-total deprivation of exercise or recreational opportunity, without penological justification, violates Eighth Amendment guarantees." *Patterson v. Mintzes*, 717 F.2d 284, 289 (6th Cir. 1983). However, the Sixth Circuit has not established a set a constitutional minimum amount of exercise for prisoners. *Rogers v. Jabe*, 43 F.3d 1082, 1086 (6th Cir. 1995).

Here, plaintiff has not alleged that he actually was denied an opportunity to exercise, only that he was not permitted to exercise on the ball field, in the location wherein he desired to exercise. The allegations, as they have been framed by plaintiff, are not based on a violation of any constitutionally-recognized right to exercise in a specific venue, and they therefore do not state a claim under § 1983.

#### b) *Grubbs v. Bradley* Claims

The allegations regarding possible violations of the settlement agreement in *Grubbs v. Bradley*, a case litigated in the Middle District, are improperly brought in this Court. The Court lacks jurisdiction over all such claims, and any and all such claims asserted in this category or in any of the following categories are **DISMISSED** for want of jurisdiction.

#### c) TMS Claims

21

Plaintiff's contentions concerning the TMS and the impact this management policy has had on the cell door locking system, the law library, and custody levels cannot proceed. This is so because class action certification has been denied and, absent such certification, plaintiff's claims challenging the TMS are limited to instances in which his own constitutionally-protected rights were violated. *See, e.g., Newsom v. Norris*, 888 F.2d 371, 381 (6th Cir.1989). No such contentions are contained within *this* claim. Therefore, plaintiff's assertions about the problems incurred due to the implementation of the TMS, as presented in this "Overcrowding and Staffing" category of claims, do not state a claim for relief.

### D. Assertions Involving Plaintiff Montague (Compl., pp. 14-19, 22, 33)

#### 1. Allegations

Implementation of the TMS affects plaintiff Montague adversely by limiting his time in the law library to one to two hours per day, space permitting; by eliminating four computers in the law library; by replacing the former classification system with a different and more dangerous one to inmates; by reducing or entirely eliminating religious programs; by lowering the caloric content of his diet and the square footage in his cell; and by causing sleep disruptions, in that he is awakened by an officer at 10:00 PM and required to move and is awakened again for the 5:30 AM "head count" and required either to sit up in bed or to stand up. The TMS is beset by numerous problems, which in combination may amount to cruel and unusual punishment. Montague suffers from an unidentified skin problem, but has had his medications stopped.

Plaintiff Montague and other Muslim inmates are not permitted to purchase Halal prayer oil from a vendor other than Union Supply, who is the vendor TDOC has approved. This approved vendor is the only vendor from which inmates may order Halal prayer oil.

#### 3. Law & Analysis

22

To the extent plaintiff's allegations involve any future effect the TMS might have on him, any such allegations are speculative. The Supreme Court has cautioned that "[e]specially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative." *Eccles v. Peoples Bank of Lakewood Village, Cal.*, 333 U.S. 426, 431 (1948). Allegations which are based on conjecture, rather than any true detriment to plaintiff caused by the implementation of the TMS, do not present a case or controversy over which the Court has jurisdiction. *Whitmore v. Arkansas*, 495 U.S. 149,158 (1990) ("Allegations of possible future injury do not satisfy the requirements of Art. III [standing].")

The current effects allegedly inflicted on plaintiff by virtue of the implementation of the TMS are the reductions in law library access, the number of calories in his diet, and the square footage in his cell and the sleep deprivation causes by nighttime interruptions for head counts. Again, for reasons noted with respect to previous claims, plaintiff has not pled viable constitutional claims.

### a) Restricted Access to the Law Library/ Computer Removal

While there is no freestanding right to a law library, *Lewis*, 518 U.S. at 351, a prisoner has a right to meaningful access to the courts. *Bounds v. Smith*, 430 U.S. 817, 822 (1977). However, as the Court has already found, plaintiff has not shown prejudice to any efforts to pursue a non-frivolous legal claim regarding his conviction or conditions of confinement litigation and, thus, he fails to state a claim with regard to his claim of diminished hours in the prison law library or the removal of computers. *Pilgrim*, 92 F.3d at 416 (citing *Lewis*).

### b) Food Claim

Under the Eighth Amendment, prisoners must be provided meals nutritionally sufficient to sustain their normal health. *Cunningham v. Jones*, 567 F.2d 653, 660 (6th Cir. 1977); *Smith v.*

23

*Sullivan*, 553 F.2d 373, 380 (5th Cir. 1977) (inmates must be provided "well-balanced meal, containing sufficient nutritional value to preserve health"). Plaintiff maintains that the caloric content of the food he is served falls below minimum standards and that the food, on this basis alone, is constitutionally inadequate. Nonetheless, he has failed to indicate that, due to the reduced number of calories provided in his diet, he has lost weight or has suffered any other adverse effects which impacted his well-being. Absent contentions such these, there is nothing factual from which the Court can reasonably infer that the food plaintiff is being served falls below the *constitutional* nutritional floor. These contentions also fail to state a § 1983 claim.

### c) Inadequate Cell Space

The assertion regarding the reduced square footage in plaintiff's cell, for reasons explained earlier in this opinion, *see supra*, Claim V.A.2, "General Claims of Unconstitutional Conditions and Violations of Rights," fail to state a claim for relief under §1983.

### d) Inadequate Sleep

To the extent that plaintiff is challenging the 5:30 AM head count which requires him to sit up in bed or stand up and, thereby, interrupts his sleep, is not a claim which this Court can entertain. The Supreme Court has instructed that "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). And it likewise has observed that "the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial." *Id*. at 548. Because the operation of a prison is an extraordinarily difficult endeavor, which measures to adopt to address a prison's security

24

concerns is a matter assigned to the sound discretion of the institutional officials. *See Block*, 468 U.S. at 591.

Unquestionably, security is a primary concern of prison administrators. "[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." *Bell*, 441 U.S. at 546-47 (quoting *Pell v. Procunier*, 417 U.S. 817, 823 (1974)). Undoubtedly, head counts of inmates are measures designed to preserve institutional security. *Walker v. Nunn*, 456 F. App'x 419, 423 (5th Cir. 2011) (finding that "daily counts were reasonably related to legitimate penological interests"); *Holly v. Woolfolk*, 415 F.3d 678, 680 (7th Cir. 2005) (citing to a state law mandating three daily headcounts as a security measure); *Mahaffey v. Major*, No. 3:06-3383-SB-JRM, 2008 WL 759086, at *7 (D.S.C. Mar. 20, 2008) (noting the "legitimate, non-punitive purpose of maintaining security at the detention center by having accurate headcounts").

Any attack on the early morning head count itself, regardless of any sleep disruption it causes to plaintiff, is a matter best left to the prison administrators who decide whether, when, and how to conduct reasonable head counts.

That said, the Court recognizes that "sleep is critical to human existence." *Walker v. Schult,* 717 F.3d 119, 126 (2d Cir. 2013). And a claim regarding sleep deprivation could plausibly amount to an Eighth Amendment claim. *Garrett v. Thaler*, 560 F. App'x 375 (5th Cir. 2014) (finding that inmate had plausibly alleged a denial of one of life's necessities by claiming that his four hours of scheduled sleep were interrupted by head counts, causing "negative long-term health effects" and that he was forced to choose between eating and sleeping).

Here, however, there are no allegations which rise to the level of a sufficiently serious deprivation and none to show that any defendant was deliberately indifferent to plaintiff's need

25

for adequate sleep. Therefore, plaintiff fails to establish that the 5:30 AM head count impinged on his constitutional rights. This claim too fails to state a viable § 1983 claim.

### e) Medical Claim

Plaintiff's assertion involving the termination of medications used to treat his skin problem resulting from "Mod Poisoning" falls within the scope of the Eighth Amendment (Doc. 1, p. 22). Deliberate indifference to the serious medical needs of prisoners constitutes an unnecessary and wanton infliction of pain and, therefore, a violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

Plaintiff has not identified the nature of his skin problem, beyond explaining that it was "Mod Poisoning from SCCF prison." In addition, plaintiff has not indicated which, if any, defendant knew that his medication was being discontinued and, having drawn the inference of a substantial risk to plaintiff's health from the withdrawal of the medication, failed to take action to address or ameliorate the potential harm. Absent an allegation from which to infer that plaintiff has a serious medical need and that a defendant possessed a culpable state of mind, plaintiff has not stated an Eighth Amendment claim.

### f) First Amendment (Free Exercise-Halal Oil)

The final contention in this category, that Halal oil must be purchased from a TDOC-approved vendor, does not state a First Amendment violation. "An inmate who challenges the constitutionality of a prison regulation or policy that limits the practice of religion must first establish that it infringes upon a sincerely held religious belief." *Hamilton v. Schriro*, 74 F.3d 1545, 1550 (8th Cir. 1996 (citing *Hill v. Blackwell*, 774 F.2d 342-43 (8th Cir. 1985)). And it is "[o]nly after a prison inmate shows a sincere belief that his or her religion requires the practice at

26

issue does the court move on to determining whether the prison's actions restricting the practice are valid." *Barhite v. Caruso*, 377 F. App'x 508, 510 (6th Cir. 2010) (citations omitted).

There are no assertions of fact to show that plaintiff's First Amendment free exercise rights have been infringed upon. For example, plaintiff has not explained how the *source* of his prayer oil, rather than the *application* of prayer oil to his body, comprises a tenet of his belief system nor has he shown how his inability to purchase prayer oil from a different vender transgressed a sincerely held belief in the Islamic faith. Notably, plaintiff does not claim that he cannot obtain prayer oil or that prayer oil had been proscribed altogether, but only that he dislikes being limited to purchasing prayer oil from one authorized vendor.

The free exercise clause shelters an inmate from violations of his sincerely held religious beliefs, but it does not prohibit a policy which hinders his ability to buy prayer oil from his choice of vendors. *See Davis v. Powell*, 901 F. Supp. 2d 1196, 1232 (S.D. Cal. 2012) (finding that a prisoner did "not have a constitutional right to a vendor of his choice" for his purchase of prayer oil"); *Thomas v. Little*, No. 07-1117-BRE/egb, 2009 WL 193873, at \*5 (W.D.Tenn. July 6, 2009) (holding that a prisoner who challenged the same TDOC authorized-vendor policy possessed no constitutional entitlement to order prayer oil from a vendor of his own choosing); *Kensu v. Cason*, No. 1:91–CV–300, 1996 U.S. Dist. LEXIS 5468, at \*45–47 (W.D.Mich. Mar. 29, 1996) (approving a prison policy providing that religious oil must be ordered from the state approved vendor, which sold only Moroccan oil, based on a failure to establish any meaningful religious difference between Muslim and Buddhist oils).

The Court concludes that plaintiff has not stated a claim which would entitle him to relief under § 1983.

**D. Assertions as to Other Prisoners (Compl., pp. 21-22, 27-28, 33-34)**

27

Daniel Banks, who is not one of the twenty-nine plaintiffs in this suit, has medical problems which have gone untreated. Plaintiff Daniel Swinney has experienced medical problems, which have not been timely treated. Also, plaintiff Swinney's medications were stopped without reason, and he was informed that he should purchase his medications from the commissary. Two other unidentified inmates respectively have a hernia and a torn rotary cuff, but neither of them has been scheduled for surgery. Likewise, an inmate whose body contains a bullet has not had surgery scheduled or performed to excise the bullet. Obstacles exist which bars inmates who are in wheelchairs from obtaining access to showers. And Stephen Wlodarz, an inmate who uses a wheelchair, fell in the shower, exacerbating a hip problem, and he experienced a lengthy delay in securing medical attention for his hip. Inmate Wlodarz is not a plaintiff in this lawsuit.

As observed, plaintiff may not assert the rights of any other prisoner, as he lacks standing to do so. *See Whitmore, v. Arkansas*, 495 U.S. 149, 166 (1990). Of course, plaintiff Swinney may assert any of the claims he may have in his amended complaint.

### E. Injuries Resulting from the Alleged Constitutional Violations (Compl., p. 21)

All plaintiffs have suffered mental and emotional distress as a result of the conditions, treatment, and events alleged herein. As noted earlier, plaintiff lacks standing to present allegations as to the mental and emotional injuries suffered by other inmates. *See Whitmore*, 495 U.S. at 166. To the extent that plaintiff has alleged that he himself has sustained mental and emotional injuries, the Court has not found that he has stated any viable constitutional claims and, absent a constitutional violation, any injuries to plaintiff, emotional or otherwise, are not recognizable claims.

### D. Relief Sought (Compl., pp. 34-37)

28

## 1. Injunction

The pleading requests issuance of an injunction, directing the defendants: 1) to stop the part of TMS related to security levels and housing, or to house minimum security units in the general population and close security inmates in separate housing facilities at all TDOC facilities; 2) to eliminate the 5:30 AM head count, to ensure that TDOC inmates' sleep is not disrupted; 3) to fix cell door locks and to maintain them in good working order; 4) to assure that the square footage in each cell complies with the performance-based standards established by the American Correctional Association and to convert cells originally designed as single cells, which were remodeled to house a second inmate, back to their original design as single cells; 5) to refrain from forcing inmates who dislike each other to share cells; 6) to furnish inmates with a 2,300 calorie a day diet; and 7) to place TDOC under federal control for violating the settlement agreement in *Grubbs v. Bradley* and for the other constitutional abridgments alleged herein.

Granting an injunction depends upon four factors—whether a plaintiff is likely to succeed on the merits; whether he will suffer irreparable injury in the absence of an injunction; whether the injunction will cause substantial harm to others; and whether the injunction would serve the public interest. *Overstreet v. Lexington-Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002) (citations omitted). It is a plaintiff's burden to prove that he is entitled to this relief. *Helling v. McKinney*, 509 U.S. 25, 35 (1993).

Plaintiff cannot show he is entitled to this relief because Court has not found any constitutional violations to have been alleged in the pleading. Furthermore, he has not alleged that he will suffer an irreparable injury if the prison continues to be managed under the TMS. Defendant officials would be harmed if the TMS were enjoined from further application in NECX, as they have a paramount interest in operating that prison effectively, safely, and

29

efficiently. The public also has an interest in the safe and cost-effective operation of state prisons, but also an interest in ensuring that inmates committed to the care of TDOC are treated humanely and have their dietary and medical needs met. Three factors weigh against an injunction and the fourth is a draw. Therefore, plaintiff's request for an injunction is **DENIED** (Doc. 2).

### 2. Declaratory Relief

Likewise, the complaint asks for declaratory relief, specifically a declaration that Commissioner Schofield and Warden McAllister have violated state and federal law and the settlement agreement in *Grubbs v. Bradley*. The pleading also seeks a declaration that the TMS is preempted by state law and that TDOC's use of TMS in its prisons violates state law and the settlement agreement in *Grubbs v. Bradley*.

Because the Court has already determined that it lacks jurisdiction over alleged violations of the settlement agreement in *Grubbs v. Bradley*, the Court declines to issue an order with respect to any alleged violation of that the settlement agreement. Likewise, because plaintiff has not stated any constitutional claims, the Court exercises its discretion to **DENY** plaintiff's requests for declaratory relief, with respect to the TMS or other purported federal law violations. *Public Affairs Associates, Inc. v. Rickover*, 369 U.S. 111, 111 (1962).

### VII. Pending Motions

Plaintiff Montague has filed a motion to alter or amend the deficiency order, under Rule 59 of the Federal Rules of Civil Procedure, on behalf of all inmates who signed the complaint (Doc. 57). A second motion, also filed by plaintiff Montague, asks the Court to issue an injunction, to direct service of process on the defendants, and to order the defendants to perform psychological evaluations and interviews upon the entire NECX inmate population, so as to

30

determine whether the implementation of the TMS and other conditions of confinement alleged in the complaint has caused the population of inmates to suffer from anxiety disorders, depression, physical health problems and stress (Doc. 95). As noted, because plaintiff Montague is not a lawyer or a class representative and because he cannot file motions on behalf of other inmates, the Court will not consider the motions. *See* 28 U.S.C. § 1654 (providing that parties may conduct their cases personally or by counsel). The Clerk is **DIRECTED** to strike the motions (Docs. 57 and 95).

## VIII. Conclusion

The plaintiff has failed to state a constitutional claim in this pleading. However because the complaint was drafted under the premise that it would proceed as a class action and because the Court has denied the request for class certification, the Court will allow plaintiff Montague to amend his complaint. *See LaFountain v. Harry*, 716 F.3d 944, 951 (6th Cir. 2013) ("Under Rule 15(a) a district court can allow a plaintiff to amend his complaint even when the complaint is subject to dismissal under the PLRA."). Therefore, **unless** within twenty (20) days from the date on this order, plaintiff amends his complaint to state a claim entitling him to relief under § 1983, the Court will **DISMISS** this case with prejudice.

The Court also will **DISMISS** the newly-opened cases of plaintiffs: 1) John Anderson, 2) Gregory Bowman, 3) Ronald Brewer, 4) Larry Brown, 5) Nikos Burgins, 6) L. Churchwell, 7) Milton Cooper; 8) Carlos Eaton, 9) Orlando Fields, 10) David Lackey, 11) Craig Majors, 12) Aaron Malone, 13) Leon McKissack, 14) Victor D. McMiller, Sr., 15) William Newby, 16) Norman Page, 17) Jose Perez, 18) Baron Pinkney 19) Samuel Ramsey, 20) Darrell Swinney, 21) Kevin Tate, 22) Octavious Taylor, 23) Walter Webb, 24) Hugh Williams, 25) Ricardo Wiggins, and 26) Tony Williams, **unless** within twenty (20) days from the date on

this order, each plaintiff amends his complaint to state a claim entitling him to relief under §
1983.

Finally, the Court **GRANTS** plaintiff Odell Wisdom's motion to voluntarily dismiss his
lawsuit (Doc. 93), and **ORDERS** that his case is **DISMISSED**.


**SO ORDERED**.

**ENTER:**


LEON JORDAN
UNITED STATES DISTRICT JUDGE